William Eugene BEARD, Plaintiff in Error,

v.

STATE of Tennessee, Defendant in Error.

Court of Criminal Appeals of Tennessee.

June 22, 1972.

Certiorari Denied by Supreme Court

Sept. 18, 1972.

Henry Hall Waller, Jr., B. F. (Jack) Lowery, Lebanon, for plaintiff in error.

David M. Pack, Atty. Gen., Everett H. Falk, Asst. Atty. Gen., Nashville, Baxter Key, Jr., Dist. Atty. Gen., Carthage, for defendant in error.

O'BRIEN, Judge.

## OPINION

Defendant, William Eugene Beard, appeals in error from his jury conviction of murder in the first degree and resulting sentence of twenty years and one day in the Penitentiary.

Six assignments of error are made. The 1st and 3rd assignments attack the weight and sufficiency of the evidence on the

theory that a dying declaration was improperly admitted into evidence and any other evidence of conviction in the record is circumstantial and insufficient to warrant the verdict of the jury.

It is contended by defendant that the alleged statements by the deceased were not a dying declaration in the sense that would except them from the hearsay rule; that there must be a definitive showing that the declarant was in "articulo mortis", and that the State has failed to establish that declarant was in "articulo mortis", or that he was fully conscious of his impending death.

■ "Articulo mortis" is defined in Volume 6 C.J.S., page 777, and in Black's Law Dictionary, Third Edition, as "At the point of death; in the article of death, which means at the moment of death; in the last struggle or agony."

The testimony relevant to the admission of this statement of the deceased is that about 6:00 o'clock in the morning on the 23rd of September, 1967, Mr. & Mrs. Roy Watson, who resided about three miles out from Auburntown in Wilson County, heard the sound of an automobile horn. Mrs. Watson went to the door and found a car almost at her door steps. A man stumbled out of the car and dragged himself up on the porch, and said, "Open the door and let me come in. I have been shot. Call the ambulance. Oh Lord, have mercy on me." "Just look what Eugene Beard did to me." Mrs. Watson testified further, that she called her husband, but did not call the ambulance immediately because she thought the man was drunk. He had a few spots of blood on him, not many. She thought he had been in a fight. Her husband went out and said he had been shot. She was looking for a number to call. She was going to call Taylor Willard. Her husband said, "Don't call him. Call the sheriff." Taylor Willard, who was the game warden and deputy sheriff, came to the

house. Mrs. Watson wanted to get a quilt to cover the injured man, but Taylor Willard said, "He is suffering too bad." When the ambulance got there, the injured man was dead.

Roy Watson confirmed the testimony of his wife as to the hour and circumstances occurring which aroused them. His wife looked out first and said there was a drunk out there. Watson had worked late the night before. He told his wife to be real quiet and maybe the man would leave. The man kept hollering, so she kept wanting him to get up. He got up and went to the door and the man was hollering for help. He was hollering, "Come and help me and listen to what I have got to say." After some discussion with his wife about whether he should go outside, Mr. Watson went out another door because the injured man was across the front door and he couldn't get out that way. He asked the man what was the matter, and he said he was shot. Mr. Watson then observed that the man had been shot in the jaw, went back in the house and told his wife to call an ambulance. He testified, "I asked him who shot him, and how come him to get into it and he said, 'Eugene Beard shot me', and I asked him what did they get into it about, and he said he knew too much about some bank robberies. . . . We called an ambulance and they came, but Mr. Willard got there first and Mr. Willard asked him just what I did." The injured man asked the Lord to help him. He was dead before the ambulance arrived.

This testimony was apparently developed out of the presence of the jury at a previous trial. It appears that objections had been made at the previous trial on the grounds that the dying declaration in this case did not come within the exception to the hearsay rule because of the manner in which it was made. The same motions were entered without objection by the State, and considered and overruled by the Court in this case.

The defendant's brief cites numerous cases dealing with this question to support the theory that the State did not establish that declarant was in "articulo mortis" and was fully conscious of his impending death. We are of the opinion that the rule announced in Anthony v. State, 19 Tenn. 265, at pages 279–281 remains as authority on this issue and has not been changed by the subsequent decisions.

"As to the other ground of objection, namely, that there is not sufficient evidence to show that the deceased knew or thought herself to be in imminent danger of death at the time the declaration was made, a majority of the Court are of opinion that it also is not tenable. The general principle deduced from all the cases is stated, 1 East, P.C. 354, to be that 'it must appear that the deceased, at the time of making such declarations, was conscious of his danger, such consciousness being equivalent to the sanction of an oath; and that no man could be disposed, under such circumstances, to belie his conscience, none at least who had any sense of religion. But such consciousness need not have been expressed by the deceased. It is enough if it might be collected from circumstances; and the Court are to judge of this consciousness previous to this sort of testimony".

. . . "It is obvious that this rule or principle, so distinctly stated, does not mean that the inference may be drawn from the mere fact that the wound, in the opinion of the man of science, was in point of fact mortal; but that the nature of the wound or the state of illness should be such as to affect the knowledge, and control the opinion of the dying person himself, as to the danger to which he stands exposed;" . . .

Also, as stated in Dickason v. State, 139 Tenn. 601, 202 S.W. 922:

"The competency of a dying declaration is ordinarily a mixed question of law and fact. While this court, therefore, has power to review the action of the trial judge in such a matter, it being merely a question of the admissiblity of evidence, we very seldom do so. Where the fact of the declarant's condition depends on the credibility of witnesses examined by the judge, great weight is to be attached to his conclusion. This court will not reverse, unless there is manifest error. Such is the rule in most appellate tribunals." . . .

We have reviewed all of the testimony surrounding this declaration on the part of the deceased, and conclude the trial court acted correctly in admitting the declaration to the jury. Defendant's own pre-trial admissions placed him at the scene of the homicide. The statements made by him in his own defense at trial were not required by admission of the dying declaration. Assignments No. 1 and 3 are found to be without merit.

The 2nd assignment charges the trial court erred in overruling defendant's motion for dismissal on the grounds that he had been denied a speedy trial in violation of his constitutional rights and in violation of TCA Sec. 40–2001.

The warrant for defendant's arrest was dated September 23rd, 1967. A true bill was returned on December 8th, 1967. The transcript includes a motion for speedy trial filed by defendant on May 3rd, 1968. The transcript also shows a second demand for a speedy trial, which indicates it was filed on August 18th, 1969, but which also contains a notation "nunc pro tunc 11–27–70", with the initials R.W., which apparently are those of the clerk, Ray Woodard. We do not understand the significance of the nunc pro tunc notation, however, the only indication in this record of any proceedings on the motion for a dismissal for failure to provide a speedy trial is found in defendant's motion for new trial. There is nothing in the record to indicate action on any pretrial motion, or any order of the

trial court thereon. There is no showing that defendant has been prejudiced in any way by State delay, or that there has been any delay which was unreasonable or improper, or beyond societal interest in the orderly administration of justice.

The actual delay in this case between the date of indictment, December 8th, 1967, and defendant's original trial on August 28th, 1969, was apparently brought about for numerous reasons. On the day of his state arrest defendant was indicted, and subsequently tried, in Federal Court. Somewhere in the interval, he was put to trial in Davidson County and sentenced to the Penitentiary for a different offense. He also escaped at least once during that time. There is no question that some of the delay was brought about by defendant's own acts. The original judgment against him was set aside on December 8th, 1969, and he was subsequently retried on November 10th, 1970. The delay between those dates is adequately accounted for.

There are several United States Supreme Court decisions of fairly recent origin (United States v. Ewell, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966); Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967); Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969); Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970).), each of which set forth, in part, the constitutional mandate of the right to a speedy trial, and we have studied these decisions for the purpose of determining to what extent the circumstances of the case sub judice fall within their purview. The United States Supreme Court has said:

"Doubtless the doctrine of stare decisis is a salutary one and to be adhered to on all proper occasions, but it only arises in respect of decisions directly upon the · points in issue." Pollock v. Farmers' Loan & Trust Company, 157 U.S. 429, 574, 15 S.Ct. 673, 687, 39 L.Ed. 759.

"Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." KVOS, Inc., v. Associated Press, 299 U.S. 269, 279, 57 S.Ct. 197, 81 L.Ed. 183, 188.

*Klopfer,* supra, stands primarily for the principle that the Fourteenth Amendment makes applicable to the States the Sixth Amendment guarantee of a right to a speedy trial; while *Ewell,* supra, in sustaining a conviction in which there was a nineteen month interval between original arrest and the hearing on subsequent indictments, held basically that "[c]onstitutional guarantee of right to a speedy trial is an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair ability of accused to defend himself", and went on to say that the essential ingredient of constitutional right to speedy trial is orderly expedition and not mere speed. Smith v. Hooey, supra, reiterated those rights enunciated in *Ewell* and *Klopfer,* in a case where the defendant, while incarcerated in a federal penitentiary, made repeated and constant efforts over a six year period to be brought to trial on a Texas State charge. Even in that extreme case, the United States Supreme Court did not order the Texas charges dismissed, but remanded the case for further proceedings not inconsistent with their opinion. The only pertinent addition to *Ewell* and *Klopfer* made in *Hooey* is spelled out in the separate concurring opinion by Justice Harlan, which we take to have the weight of authority since it does not conflict with the majority opinion, wherein he stated that, "This case is one of first impression for us, and decides a question on which the state and lower federal courts have been divided. Under these particular circumstances, I do not believe that Texas should automatically forfeit the right to try peti-

tioner. If the State still desires to bring him to trial, it should do so forthwith. At trial, if petitioner makes a *prima facie* showing that he has in fact been prejudiced by the State's delay, I would then shift to the State the burden of proving the contrary." Dickey v. Florida, supra, followed *Ewell, Klopfer,* and *Hooey,* and reversed a conviction in the State of Florida because the defendant there had exerted every effort to require the State to try him and there was abundant evidence in the record of actual prejudice to petitioner in the death of two potential witnesses, unavailability of another, and the loss of police records.

■ Such is not the case here. We find that the delay was not extensive or unwarranted under the circumstances of the case and we are able to ascertain from the transcript that the delay was brought about, at least in part, by the defendant himself. Under the totality of the circumstances we do not find error in the action of the trial court in denying defendant a new trial on this ground, nor such prejudice to the defendant which would amount to a constitutional denial of due process. The assignment is overruled.

■ The 4th assignment charges error in overruling defendant's motion to dismiss the indictment because the State had failed to prove venue of the crime. We find this assignment to be without merit. The evidence in this case sufficiently established the location of the homicide to warrant the action of the trial judge in overruling defendant's motion to dismiss the indictment.

The 5th assignment charges error to the trial court in overruling defendant's plea of former jeopardy.

■ Defendant's plea of former jeopardy filed in the trial court includes as an exhibit indictment No. 14102 in the United States District Court for the Middle District of Tennessee, filed on September 26th, 1967, containing 8 counts, and charging this defendant, among other things, with the death of James Larry Ferguson. The plea alleges that this defendant was found guilty by a jury in the federal court and received a sentence of fifty years for this said offense and other offenses enumerated in the said indictment, and that this is the same offense of murder for which he is being tried in the State of Tennessee. There is no other evidence in the record on this issue, and without more this assignment could not be sustained. In addition, the law in the United States, and in Tennessee, as set forth in State v. Rhodes, 146 Tenn. 398, 242 S.W. 642, has been re-affirmed and sustained by Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729, and Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684, which two cases are the latest federal authority on this point:

> . . . "That the same act may be an offense against the laws of two governments, may be punished by both, and that a plea of former jeopardy in a tribunal of one government is not available in a tribunal of the other, are propositions fully demonstrated by the decisions of this court and of the Supreme Court of the United States." State v. Rhodes, 146 Tenn. 398, 242 S.W. 642 (1922).

■ The 6th assignment charges error to the trial court in overruling defendant's motion to disallow the State from trying the said defendant again on a charge of first degree murder since the jury that previously tried him found him guilty of first degree murder and sentenced him to twenty years in prison, *the same being a void judgment,* (emphasis added) and that it was impossible for the said jury to give the defendant more time on his second trial than he received on a first trial, making it legally impossible for the State to try him again on a charge of first degree murder.

The fallacy of the reasoning in the foregoing assignment is set forth in the statement, *"The same being a void judgment."* The zeal of counsel is to be commended, but the logic of the argument cannot be upheld. In this case the defendant successfully sought a new trial on the grounds that the verdict of the jury fixed the punishment less than the minimum provided by law for the offense of murder in the first degree. The trial court held, and correctly so that the judgment was void, and directed a re-trial. The defendant now complains of that which he sought, that is, a new trial. One day was added to the sentence, which now falls within the minimum fixed by the statute. We do not find error in the action of the trial court and the assignment is overruled.

The judgment of the trial court is affirmed.

GALBREATH and RUSSELL, JJ., concur.